# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**SCOTT WELDEN,**

      **Plaintiff,**

|  |  |
|---|---|
| **v.** | **Case No. 2:15-cv-2410**<br>**Chief Judge Edmund A. Sargus, Jr.**<br>**Magistrate Judge Elizabeth P. Deavers** |

**ARTHUR HALE M.D.,** *et al.*,

      **Defendants.**

## REPORT AND RECOMMENDATION

Plaintiff, Scott Welden, a former[1] Ohio inmate who is proceeding without the assistance of counsel, brings this civil rights action under 42 U.S.C. § 1983 against Defendants, Arthur Hale, M.D., Andrew Eddy, M.D., and Kathleen DeLaCruz, M.D., alleging that he was subjected to medical indifference in violation of the Eighth Amendment. This matter is before the Court for consideration of Defendants' Motion for Summary Judgment (ECF No. 31), Plaintiff's Opposition to Defendant's Motion (ECF No. 37), and Defendants' Reply in Support of Their Motion (ECF No. 40). For the reasons that follow, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED**.

### I.

The alleged events giving rise to this action occurred while Plaintiff was incarcerated at the Pickaway Correctional Institution ("PCI"). Upon intake when he was committed to the custody of the ODRC, Plaintiff declared no medical problems. (de la Cruz Declaration ¶ 25,

---

[1] On January 22, 2017, the Court received Plaintiff's notice of change of address to a location outside the custody of Ohio Department of Rehabilitation and Corrections ("ODRC"). (ECF No. 17.) Plaintiff avers that he was released from ODRC custody in May 2016. (Plaintiff Declaration ¶ 18, PAGEID # 267, ECF No. 37.)

ECF No. 31-6.) However, Plaintiff reported at that time that he had been taking Effexor (venlafaxine) and Elavil (amitriptyline), which are "psychiatric medications used for chronic pain management and treatment of mood disorders." (*Id*.) Plaintiff was also "completely candid and transparent with [his] history of addiction to both opiates and amphetamines." (Plaintiff Declaration ¶ 4, PAGEID # 266ECF No. 37.)

On or around October 12, 2013, Plaintiff requested an increase in his Balcofen prescription. (Interdisciplinary Notes 2, ECF No. 31-3.)

Plaintiff complained of muscle spasms in his lower legs, requesting an increase in his Balcofen prescription on November 13, 2013. (Interdisciplinary Notes 3, ECF No. 31-3.) Plaintiff reported spasms that were "sometimes just twitches," "mild pain," but "mostly discomfort." (*Id*.) Plaintiff also reported that the "MRI [Magnetic Resonance Imaging test] didn't show cause." (*Id*.) On December 19, 2013, Plaintiff was seen to "discuss pain & muscle spasms to legs—reports he has relief since seeing" a doctor and Plaintiff "would like to continue receiving pain med[ication]." (*Id*. at 4.)

Plaintiff was seen on March 31, 2014, for various complaints including, *inter alia*, "exercise induced asthma, requires inhaler" and "chronic pain" "gradually getting worse" in the "lumbar" region. (*Id*. at 5–6.) A physical exam revealed no acute distress. (*Id*. at 6.) Plaintiff was prescribed an albuterol inhaler and lumbar x-rays were ordered. (*Id*.) The x-ray results dated April 1, 2014, revealed "moderate dextrocurvature of the lumbar spine[,]" "[m]oderate degenerative changes" present at L2-S1, "[m]ild to moderate lumbar spine degenerative change[,]" with "[d]egenerative change as described most significant at L2-3. MRI could be performed for additional evaluation if indicated." (Radiology Report 1, ECF No. 31-5.)

On April 14, 2014, Dr. Kenneth Saul ordered Plaintiff to begin low back exercises.

(Interdisciplinary Notes 7, ECF No. 31-3.)  Thereafter,[2] Plaintiff requested a "neuro surgical"

consult, Naprosym, Baclofen,[3] and Ultram[4] "numerous times."  (*Id*. at 8.)  Plaintiff was educated

on how to use heat and ice.  (*Id*.)  Plaintiff was giving range of motion ("ROM") exercises to

perform, but Plaintiff said he could not perform such exercises due to his "OASIS."[5]  (*Id*.)

On April 24, 2014, lumbar spine x-rays of the neutral, flexion, and extension regions

revealed the following "[m]ultilevel disc space loss and osteophyte formation," a "prominent"

facet joint at L4-5 and L5-S1, no identified compression fracture, "stable mild retrolisthesis of

L3 with respect to L4, and "stable on flexion and extension views."  (Radiology Report 2, ECF

No. 31-5.)  "No significant abnormal motion is appreciated."  (*Id*.)

On May 19, 2014, Plaintiff presented to Defendant Dr. Kathleen de la Cruz with concerns

about his back.  (Interdisciplinary Notes 9, ECF No. 31-3.)  Defendant de la Cruz recalled

Plaintiff, who introduced himself to her as a physician, as "a sympathetic individual who

articulated well his somatic complaints."  (de la Cruz Declaration ¶ 9, ECF No. 31-6.)  Plaintiff

was concerned that the x-ray results of April 1, 2014, revealed "dramatic" changes in his back.

(*Id*.; Interdisciplinary Notes 9, ECF No. 31-3.)  Plaintiff denied having any numbness, tingling,

or bladder or bowel incontinence or retention, which signified "a lack of neurological

---

[2] The date has been cut off on the Court's copy of these notes.  (*Id*. at 8.)

[3] Defendants provide the following description of Baclofen:

> Baclofen is a muscle relaxer and anti-spastic agent.  It is primarily used to treat
> symptoms in people with injury or disease of the spinal cord.  Due to its addictive
> propensity as well as dangerous potential to diminish respirations when combined
> with narcotics or other pain medications, it has been removed from the Ohio
> Department of Rehabilitation and Corrections (ODRC) formulary list[.]

(Hale Declaration ¶ 9, ECF No. 31-7.)

[4] According to Defendants, "Tramadol is also known as Ultram and is a narcotic like pain
reliever used to treat moderate to severe pain and it can also be habit forming."  (*Id*.)

[5] Defendants represent that "OASIS" stands for Our Awareness of Self Increases Our Success,
which is a therapeutic community program.  (Opposition 6 n.9, ECF No. 37.)

involvement." (*Id*.) Upon physical exam, Plaintiff presented as well-developed and well-nourished, in no acute distress, normal respiratory effort, normal squat ability, normal toe and normal heel-walk ability, relatively normal flexion, extension, lateral, and rotation ROM. (*Id*.) However, because of what appeared to be an "acute" onset, Defendant de la Cruz recommended a Magnetic Resonance Imaging test ("MRI"). (*Id*.) She also prescribed an anti-inflammatory, Naprosyn. (*Id*.) In addition, Defendant de la Cruz ordered laboratory tests to assess for autoimmune disorders, which later revealed normal results. (*Id*.)

On July 1, 2014, Plaintiff was prescribed 50 milligrams of Tramadol (Ultram) for thirty days. (Interdisciplinary Notes 11, ECF No. 31-3.)

Defendant de la Cruz again examined Plaintiff on July 21, 2014, for complaints that he "can't tie shoes when he wakes up" and that "Naprosyn, Tramadol and Tylenol work[] best[.]" (*Id*.; de la Cruz Declaration ¶ 11, ECF No. 31-6.) Her physical examination revealed that Plaintiff was "upset [but] otherwise [showed] no obvious signs of pain." (Interdisciplinary Notes 11, ECF No. 31-3.) Plaintiff had "no signs or symptoms of neurological development." (*Id*.; de la Cruz Declaration ¶ 11, ECF No. 31-6.) Defendant de la Cruz ordered that Plaintiff be given a bottom bunk for six months and ordered that he continue his self-directed physical therapy and current medications. (*Id*.)

On August 5, 2014, following ODRC's Collegial Review Committee, which included participation from Defendant Andrew Eddy, M.D., ODRC's Medical Director, re-examination of Plaintiff was ordered to evaluate for possible lumbar disease causing neuropathy (nerve damage). (Interdisciplinary Notes 12, ECF No. 31-3; de la Cruz Declaration ¶ 12, ECF No. 31-6.) In addition, due in part because of Plaintiff's history of substance abuse and "largely due to the lack of any objective medical evidence supporting administration of multiple analgesics," (de la Cruz

Declaration ¶ 12, ECF No. 31-6), the Collegial Review Committee recommended that Plaintiff's Tramadol (Ultram) prescription be tapered.  (*Id*.; Interdisciplinary Notes 12, ECF No. 31-3.)

On August 11, 2014, upon examination, Plaintiff presented with mild tenderness at "midline[,]" "right paralumbar[,]" and "left paralumbar[.]"  (de la Cruz Declaration ¶ 13, ECF No. 31-6.)  Plaintiff was "not complaining of N/T [numbness/tingling] so EMG [Electromyography] not indicated."  (Interdisciplinary Notes 13, ECF No. 31-3.)  However, Plaintiff reported difficulty bending, pain down his left leg (sciatic nerve), and "grinding" when performing his ROM exercises.  (*Id*.)  On examination, Plaintiff was able to walk on his heels and toes.  (*Id*.)  It was noted that Plaintiff's Tramadol (Ultram) was discontinued by Collegial Review Committee because of Plaintiff's history of substance abuse with Adderall.  (*Id*. at 13–14.)  Plaintiff was ordered to continue with heat and ice therapy.  (*Id*. at 14.)  The neurosurgery request was re-submitted.  (*Id*.)

Defendant de la Cruz met with Plaintiff and discussed his plan of care on August 19, 2014.  (Verified Complaint ¶ 24, ECF No. 1; de la Cruz Declaration ¶ 14, ECF No. 31-6; Interdisciplinary Notes 14, ECF No. 31-3.)  Plaintiff complained of ongoing chronic pain, stating that his pain has increased over the last year and that Tylenol and Motrin were no longer work.ing  (Interdisciplinary Notes 14, ECF No. 31-3.)  Plaintiff stated that when he takes Ultram (Tramadol), his pain is controlled at a pain level of five out of scale of ten, but that his pain is a level seven or eight when he does not take that medication.  (*Id*.)  Defendant de la Cruz noted that Plaintiff reported taking Naprosyn but that he reported that he is unable to perform any of his physical therapy exercises for his back.  (*Id*.)  Defendant de la Cruz further noted that she will discuss with Defendant Eddy Plaintiff's need for Ultram (Tramadol).  Following that discussion, Defendant de la Cruz noted that "ALPs [Advanced Level Providers] will not support addiction

by providing mid-altering medication.  Plan to D/C [discontinue] Baclofen and OTC [over the counter] Naprosyn."  (*Id.*)

In a letter dated August 24, 2014, addressed to Defendant Hale, Plaintiff complained of Plaintiff's current pain management regimen, which consisted of Naprosyn, Tylenol, daily core muscle building exercises and stretching, and ice twice daily.  (Verified Complaint ¶ 26, ECF No. 1; Letter addressed to Defendant Hale PAGEID # 16, ECF No. 1-1.)  Plaintiff represented that he experienced "7/10 sharp grinding pain with movement" that made it difficult to continue his strengthening exercises.  (Letter addressed to Defendant Hale 1, ECF No. 1-1.)  Plaintiff stated that he was previously prescribed Tramadol and had maintained a tolerable 5/10 pain level with that medication.  (*Id.*)  Plaintiff went on to explain why he believed that it was not in his best interest to withhold appropriate pain medication.  (*Id.* at PAGEID ## 16–17.)  Defendant Hale did not respond to Plaintiff's letter.  (Verified Complaint ¶ 26, ECF No. 1.)

On or around August 26, 2014 (de la Cruz Declaration ¶ 15, ECF No. 31-6), it was noted by a non-party provider that Plaintiff "[w]hen seen on 8/11, pt. [Plaintiff] tried to hide opiate abuse, only admitted to adderol [sic] abuse."  (Interdisciplinary Notes 15, ECF No. 31-3.) Plaintiff was educated on continuing to use heat and ice therapy.  (*Id.*)  It was also noted that Defendant Eddy would be emailed "about Tramadol."  (*Id.*)

In a letter dated August 30, 2014, addressed to Defendant Eddy, Plaintiff expressed concerns related to his medical care, contending that x-rays revealed "significant objective findings that are consistent with my current pain complaint."  (Letter addressed to Defendant Eddy PAGEID # 18, ECF No. 1-1.)  Plaintiff summarized his requests for medical attention, including a prescription for Tramadol, MRI, and a neurosurgical consultation.  (*Id.*)  Plaintiff represented that a non-party provider prescribed Tramadol, but that Defendant Hale later reduced

the prescription and ultimately tapered Tramadol for fourteen days. (*Id*. at PAGEID # 19.)

Plaintiff represented that he continues to perform core strengthening exercises every day,

"flexibility exercises twice a day, ice therapy twice a day, and guided meditations daily in

addition to taking Naprosyn and acetaminophen." (*Id*.) Plaintiff contended Defendant Eddy's

"indifference to my condition is discouraging" and that Plaintiff's pain would continue and asked

Defendant Eddy to "reconsider your position and allow for my chronic pain issue to be worked

up and treated appropriately." (*Id*.) Defendant Eddy did not respond to Plaintiff's letter.

(Verified Complaint ¶ 26, ECF No. 1.)

On September 8, 2014, Defendant Hale examined Plaintiff who complained of lower

back pain. (Hale Declaration ¶ 7, ECF No. 31-7; Interdisciplinary Notes PAGEID ## 205–06,

ECF No. 31-7; Verified Complaint ¶ 27, ECF No. 1.) Upon examination, Plaintiff denied

numbness, tingling, and decreased strength in his lower legs, and he had no difficulty walking on

his toes or heels. (Interdisciplinary Notes PAGEID # 205, ECF No. 31-7.) Defendant Hale

advised Plaintiff to be careful taking additional pain medications (*id*.) when Plaintiff revealed

that he needed to take an extra dose of Naprosyn and Tylenol. (Verified Complaint ¶ 27, ECF

No. 1.) Defendant Hale found Plaintiff "to have no neurological involvement whatsoever and in

addition, I found that the Plaintiff failed to present with any signs or symptoms of back pain

warranting more than strengthening exercises and over the counter NSAID[6] medications." (Hale

Declaration ¶ 7, ECF No. 31-7 Hale Declaration ¶ 7, ECF No. 31-7.) During the examination,

Plaintiff reported doing the "Insanity Workout" three to four times a week. (*Id*.; Interdisciplinary

Notes PAGEID # 205, ECF No. 31-7.) "The Insanity Workout is an extreme cardio workout that

involves squatting, pushups and continual jumping[.]" (Hale Declaration ¶ 8, ECF No. 31-7.)

_____

[6] NSAID stands for "Non-Steroidal Anti-Inflammatory Drugs." (de la Cruz Declaration ¶ 20,
ECF No. 31-6.)

Defendant Hale refused to refer Plaintiff to a specialist.  (Verified Complaint ¶ 27, ECF No. 1.)

On December 22, 2014, Defendant de la Cruz examined Plaintiff, who complained of back pain and requested an MRI and an orthopedic consult.  (*Id*. at ¶ 16; Interdisciplinary Progress Notes PAGEID # 184, ECF No. 31-3.)  Plaintiff reported that he was doing the physical therapy exercises "as much as he can."  (Interdisciplinary Progress Notes PAGEID # 184, ECF No. 31-3.)  Defendant de la Cruz noted that "[o]n Sept. 22nd I witnessed this patient running, bending, swinging, twisting, jumping while playing aggressive game of pickleball.  He agrees he plays the game[,]" but denied playing it on that date.  (*Id*.; de la Cruz Declaration ¶ 16, ECF No. 31-6.)  Upon examination, Defendant de la Cruz found Plaintiff to be "without neurological deficit and advised him that neither orthopedic surgery nor the medication Baclofen was warranted for his condition given his normal/above average level of function."  (de la Cruz Declaration ¶ 16, ECF No. 31-6.)

On December 24, 2014, six lumbar x-rays were taken and the results were compared to the x-rays taken on April 24, 2014.  (Radiology Report PAGEID # 196, ECF No. 31-5.)  The radiology report revealed the following results and comparison:

> Despite supine positioning, there is suggestion of mild-to-moderate dextroscoliosis centered at L2-3.  Endplate sclerosis, disc space loss and spurring is noted prominently along the convexity of the curvature.  Sacroiliac joints are normal.  Findings are most prominent at the L2-3 level.  Multilevel facet joint disease is present in the lower lumbar spine.
>
> Impression:  Severe degenerative changes similar to prior study.

(*Id*.)

On January 14, 2015, Plaintiff stopped taking Atenolol, heart-rate medication, and admitted to drinking thirty-two ounces of coffee.  (*Id*. at ¶ 18; Interdisciplinary Progress Notes PAGEID # 185, ECF No. 31-3.)  An electrocardiogram ("EKG") revealed an atrial flutter,

requiring transfer to OSU Medical Center. (*Id*.) Plaintiff returned the next day on January 15, 2015. (*Id*.)

Plaintiff failed to appear for his medical appointment on February 26, 2015. (Interdisciplinary Progress Notes PAGEID # 186, ECF No. 31-3.)

On March 24, 2015, Defendant de la Cruz examined Plaintiff who complained of "back pain though he is here for epigastric pain" according to Nursing Sick Call ("NSC"). (*Id*. at PAGEID # 187.) Examination revealed no blood in stools or black and tarry stools and no signs of Peptic Ulcer Disease ("PUD"). (*Id*.) Plaintiff's "abdominal exam was inconsistent and complaints of tenderness to palpation did not occur when patient was distracted." (de la Cruz Declaration ¶ 20, ECF No. 31-6.) Defendant de la Cruz stressed the importance of fully participating in physical therapy and to make better commissary choices, avoiding caffeine and spicy foods. (*Id*.) She also prescribed Pepcid (an acid-reducing medication) and ordered laboratory tests to assess for PUD, pancreatic dysfunction, and liver disease. (*Id*.)

Defendant de la Cruz again examined Plaintiff for complaints of epigastric pain on May 6, 2015. (*Id*. at ¶ 21; Interdisciplinary Progress Notes PAGEID # 189, ECF No. 31-3.) There was no change in his condition and Plaintiff acknowledged that he was not complaint with his treatment plan because he was not taking Pepcid as prescribed. (de la Cruz Declaration ¶ 21, ECF No. 31-6.) Plaintiff did not mention any back pain at this visit. (*Id*.)

On July 27, 2015, Defendant de la Cruz examined Plaintiff and found "no evidence of neurological involvement as it pertained to his low back pain complaints which would warrant anything more than strengthening exercises and NSAID medications." (*Id*. at ¶ 22.) Plaintiff was non-compliant with his epigastric orders, failing to take his Pepcid as prescribed and continuing to consume spicy foods and caffeine. (*Id*.; Interdisciplinary Progress Notes PAGEID

# 192, ECF No. 31-3.)

Plaintiff was seen over 113 times in PCI's medical department between February 2013, and July 2015, excluding laboratory collections, physical therapy sessions, mental health evaluations, radiology consults, and transfers to OSU Medical Center. (de la Cruz Declaration ¶ 23, ECF No. 31-6.)

Plaintiff filed the instant action on June 15, 2015, bringing a civil rights action under 42 U.S.C. § 1983 against Arthur Hale, M.D., Medical Director, Pickaway Correctional Institution, Dr. Andrew Eddy, M.D., Medical Director, Ohio Department of Rehabilitation & Correction, and Dr. Kathleen de la Cruz, M.D., Pickaway Correctional Institution, suing them in their official and individual capacities. (Verified Complaint Caption, ECF No. 1.) Following an initial screen of Plaintiff's Verified Complaint under 28 U.S.C. § 1915(e)(2), Plaintiff's medical indifference claims under the Eighth Amendment to the United States Constitution were allowed to proceed. (ECF No. 6.) In his Verified Complaint (ECF No. 1), Plaintiff alleges that Defendants' deliberate indifference resulted in unnecessary pain and suffering, that Plaintiff's "medical condition is to worsen thus making it more difficult to definitively treat in the future as well as potentially causing permanent damage to the spine." (*Id*. at ¶¶ 40–64.) Plaintiff seeks monetary damages and injunctive relief "compelling Defendants to refer Plaintiff to a medical specialist trained in orthopedic and/or neurosurgical spinal surgery that has experience with Plaintiff's degenerative conditions and for Defendants to follow the recommendation of the specialist(s)." (*Id*. at Prayer for Relief.)

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion"). "Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn*, 439 F. App'x 492, 495–96 (6th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

## III.

The Undersigned first addresses a few preliminary matters before considering the merits of Defendants' Motion.

A.      **Plaintiff's Claims for Injunctive Relief**

When an inmate files suit against prison officials at the institution of his incarceration based upon those officials' wrongful conduct seeking declaratory and injunctive relief, and that inmate is subsequently transferred or released, courts routinely dismiss the declaratory and injunctive relief claims as moot. *Sossamon v. Texas*, 563 U.S. 277, 304 (2011) (citations omitted) ("A number of . . . suits seeking injunctive relief have been dismissed as moot because the plaintiff was transferred from the institution where the alleged violation took place prior to adjudication on the merits."); *see, e.g.*, *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) (concluding that inmate's claims for declaratory and injunctive relief were rendered moot upon inmate's transfer from the prison about which he complained); *Abdur–Rahman v. Michigan Dep't of Corr.*, 65 F.3d 489, 491 (6th Cir. 1995) (finding inmate's request for injunctive relief mooted upon transfer from relevant prison); *Lavado v. Keohane*, 992 F.2d 601 (6th Cir. 1993) (same). This is because an inmate's transfer or release ends the alleged violations of his or her constitutional rights, which "render[s] the court unable to grant the requested relief." *Berger v. Cuyahoga Cty. Bar Ass'n*, 983 F.2d 718, 724 (6th Cir. 1993); *Fredette v. Hemingway*, 65 F. App'x 929, 931 (6th Cir. 2003) (concluding that an inmate's request for injunctive relief to prevent his transfer to another prison became moot upon the inmate's subsequent transfer because "the district court was unable to grant the relief requested"). "There is . . . an exception to the mootness doctrine for claims that are capable of repetition, yet evade review." *Fredette*, 65 F. App'x at 931 (citation omitted). This narrow, capable-of-repetition exception is limited to situations in which "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration" and "there was a reasonable expectation that the same complaining

party would be subjected to the same action again." *Id*. (internal quotation marks and citations omitted).

Applying the foregoing principles to the instant case, the Undersigned concludes that Plaintiff's claims for injunctive relief are moot. Because Plaintiff has been released, Defendants can no longer commit the alleged constitutional violations against him. This Court does not have jurisdiction to accord Plaintiff with prospective relief that has no effect or impact on the parties involved in this action. In addition, the capable-of-repetition exception to the mootness doctrine does not apply in this case because Plaintiff has no reasonable expectation that he will be incarcerated and subjected to the alleged constitutional violations again. Accordingly, it is **RECOMMENDED** that Plaintiff's claims for injunctive relief be **DENIED AS MOOT**.

### B.  Plaintiff's Official Capacity Claims

Although Plaintiff names Defendants in their official and individual capacities (Verified Complaint Caption, ECF No. 1), he does not appear to seek monetary damages against them in their official capacities. (*Id*. at Prayer for Relief ¶a, ECF No. 1) (seeking "[j]udgment and damages in his favor against all defendants, in their individual capacity"). However, to the extent that the Verified Complaint should be construed as Plaintiff seeking money damages from Defendants in their official capacities, the Eleventh Amendment bars his claims. The Eleventh Amendment provides as follows:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens of Subjects of a Foreign State.

U.S. Const. amend. XI. The Eleventh Amendment operates as a bar to federal-court jurisdiction when a private citizen sues a state or its instrumentalities unless the state has given express consent. *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1983); *Lawson v. Shelby*

*Cnty.*, 211 F.3d 331, 334 (6th Cir. 2000).  "It is well established that § 1983 does not abrogate the Eleventh Amendment."  *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013) (citing *Quern v. Jordan*, 440 U.S. 332, 341 (1979)).  Because Ohio has not waived its sovereign immunity in federal court, Defendants are entitled to Eleventh Amendment immunity from suit for monetary damages.  *Mixon v. State of Ohio*, 193 F.3d 389, 397 (6th Cir. 1999).

## C.    Plaintiff's Evidentiary Objections

Plaintiff "objects to many of the evidentiary material" offered by Defendants in support of their Motion.  (Opposition 7, ECF No. 37.)  Federal Rule of Civil Procedure 56 allows a party making or opposing a summary judgment motion to cite to materials in the record.  Fed. R. Civ. P. 56(c)(1)(A) (indicating that a party may cite to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials").  "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  After an objection is raised, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment; *see also Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10–cv–1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011) (stating that Rule 56(c)(2) provides "a multi-step process by which a proponent may submit evidence, subject to objection by the opponent and an opportunity for the proponent to either authenticate the document or propose a method to doing so at trial").

Here, Plaintiff specifically objects to Defendants' Exhibits A, B, and D, because these exhibits "are not admissible nor relevant."  (Opposition 7, ECF No. 37.)  Plaintiff therefore contends that "[a]ll sections that reference these exhibits should be disregarded by the Court."

(*Id*.)  Defendants disagree, arguing that Exhibits A, B, and D, are relevant and admissible.

(Reply 12–13, ECF No. 40.)  The Court considers each Exhibit in turn.

Exhibit A is a copy of a one-page document entitled "Offender Search," which details

Plaintiff's four offenses.  (Offender Search, ECF No. 31-1.)  Because the Court need not rely on

this document to resolve Defendants' Motion, it declines to address the admissibility of Exhibit

A.

Exhibit B is a four-page printout from the Ohio eLicense Center.  (Ohio eLicense Center

Printout, ECF No. 31-2.)  The printout reflects, among other things, that Plaintiff's medical

license was revoked based on

> The [State Medical] Board's determination that doctor [Plaintiff] is impaired in ability to practice according to acceptable and prevailing standards of care because of habitual or excessive use or abuse of drugs, alcohol, or other substances that impair ability to practice as evidenced by his use of Adderall, failure to provide required documentation of compliance with the terms of the 8/14/08 consent agreement, and failure to submit to random urine screens and screening processes.  Order effective 2/10/11.

(*Id*. at PAGEID # 166.)

Defendants argue that this exhibit is admissible under, *inter alia*, Federal Rule of

Evidence 803(8).  (Reply at 13.)  This Court agrees.  Rule 803(8) is a hearsay exception that

provides in relevant part that "[a] record or statement of a public office" is admissible if "it sets

out . . . in a civil case . . . factual findings from a legally authorized investigation[,] and . . . the

opponent does not show that the source of information or other circumstances indicate a lack of

trustworthiness."  Fed. R. Evid. 803(8)(A)(iii), (B).  Here, the printout is available at

http://elicense.ohio.gov, a government website.  Plaintiff has not shown, or even argued, that this

government website or any other circumstances reflect a lack of trustworthiness.  The Court

further notes that this document is relevant to the defense in this case.  *See* Fed. R. Evid. 401

(stating that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and ""the fact is of consequence in determining the action"). For these reasons, Exhibit B is admissible and relevant.

Finally, Exhibit D is a one-page conduct report reflecting that on October 18, 2013, Plaintiff refused to provide a urine sample for a drug screen. (Conduct Report, ECF No. 31-4.) Defendants argue that this exhibit is admissible under Federal Rule of Evidence 404(b) as character evidence and under Rule 401 because it is "evidence[s] Plaintiff's lengthy substance abuse and further support the reasonableness of Defendants' suspicions that Plaintiff was attempting to obtain and abuse narcotics." (Reply at 13.)

Defendants' arguments are not well taken. While this exhibit may be relevant to the defense, Defendants bear the burden of showing that the exhibit is "admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment. Here, Defendants have not authenticated Exhibit D or even attempted to explain how Exhibit D may be authenticated. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). Accordingly, Defendants cannot rely on it in their defense. *See Williams v. Case Mgmt., Inc*., No. 12-2649-dkv, 2013 WL 12100722, at *5 (W.D. Tenn. June 17, 2013) (finding that the proponent could not rely on exhibits that were unauthenticated hearsay). As such, the Court will not consider the exhibit in its analysis of Defendant's Motion for Summary Judgment.

## IV.

The Undersigned first considers whether Defendants are entitled to summary judgment on the merits of Plaintiff's medical indifference claims before considering their alternative

assertions that they are entitled to summary judgment because Plaintiff failed to properly exhaust his administrative remedies.

## A.     Merits of Medical Indifference Claim

Defendants contend that no genuine issue of material fact exists as to whether their medical care constitutes deliberate indifference in violation of the Eighth Amendment and maintain that their actions do not rise to the level of a constitutional violation. The Undersigned agrees.

It is well established that "[t]he Eighth Amendment forbids prison officials from unnecessarily and wantonly inflicting pain on an inmate by acting with deliberate indifference toward [his] serious medical needs." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010) (internal quotations and citations omitted). A claim for deliberate indifference "has both objective and subjective components." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). The United States Court of Appeals for the Sixth Circuit has explained:

> The objective component mandates a sufficiently serious medical need. [*Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir.2004).] The subjective component regards prison officials' state of mind. *Id.* Deliberate indifference "entails something more than mere negligence, but can be satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 895–96 (internal quotation marks and citations omitted). The prison official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 896 (internal quotation marks and citation omitted).

*Barnett v. Luttrell*, 414 F. App'x 784, 787–88 (6th Cir. 2011). The Sixth Circuit has also noted that in the context of deliberate indifference claims:

> [W]e distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment. Where a prisoner alleges only that the medical care he received was inadequate, federal courts are generally reluctant to second

> guess medical judgments. However, it is possible for medical treatment to be so woefully inadequate as to amount to no treatment at all.

*Alspaugh*, 643 F.3d at 169 (internal quotations and citations omitted). "A prisoner's allegation that a prison has failed to treat [a prisoner's] condition adequately . . . is evaluated under the effect-of-delay standard[,]" which "'requires the submission of verifying medical evidence to establish "the detrimental effect of the delay in medical treatment.'" *Anthony v. Swanson*, No. 16-3444, 2017 WL 2992224, at *3 (6th Cir. July 14, 2017) (quoting *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citation omitted)). Additionally, "[o]rdinary medical malpractice does not satisfy the subjective component." *Grose v. Corr. Med. Servs., Inc.*, 400 F. App'x 986, 988 (6th Cir. 2010). Moreover, "a difference of opinion between [a prisoner] and the prison health care providers and a dispute over the adequacy of [a prisoner's] treatment . . . does not amount to an Eighth Amendment claim." *Apanovitch v. Wilkinson*, 32 F. App'x 704, 707 (6th Cir. 2002).

Here, Defendants contend that no genuine issue of material fact exists regarding either of the elements of a deliberate indifference claim. The Court will address each element in turn.

### 1. Objective component

With respect to the objective component, Defendants deny that Plaintiff was suffering from a sufficiently serious medical need regarding his back. (Motion 16–17, ECF No. 31; Reply 3–11.) Plaintiff disagrees, arguing that he suffered a serious medical condition and that Defendants did not adequately treat his back pain. (Opposition 2–6, ECF No. 37.) Because Plaintiff alleges that his back condition was not adequately treated and alleges that he was denied a specific type of treatment, he must submit "verifying medical evidence" to show the detrimental effect of the delay in medical treatment. *Swanson*, 2017 WL 2992224, at *3–4. In support, Plaintiff attaches and refers to ODRC medical records reflecting treatment during the relevant period while he was incarcerated at PCI (Plaintiff's Exhibits 1 and 3, Medical Records

and Radiology Reports PAGEID ## 245–265, 269–70, ECF No. 37) as well as his own declaration (Plaintiff Declaration PAGEID ## 266–68, ECF No. 37).  Plaintiff specifically relies on the Radiology Reports from April 1 and 24, 2014, and December 24, 2014 (collectively, "Radiology Reports" or "x-rays"), averring that these "show severe degenerative changes of the spine that are not usually seen in patients younger than 70 years old.  These findings were objective evidence for the severe pain I was experiencing."  (Opposition 5, ECF No. 37; Radiology Reports PAGEID ## 269–70, ECF No. 37; Plaintiff Declaration ¶ 6, PAGEID # 266, ECF No. 37.)  Plaintiff takes the position that this condition required specific types of treatment: "an MRI, a Neurosurgical consultation, and pain medications/muscle relaxers."  (Opposition 4, ECF No. 37 (citing Exhibits 1 (medical records) and 2 (Plaintiff's Declaration)).)  As to his ability to interpret these records, Plaintiff avers that he "has worked as a clinical emergency medicine physician for 10 years and have a strong background in clinical medicine" and "has training and experience with addiction."  (Plaintiff Declaration ¶ 3, PAGEID # 266, ECF No. 37.)

As an initial matter, Defendants challenge the sufficiency of Plaintiff's Declaration, which purports to "give his own expert advice of patients with substance abuse history[.]" (Reply 10, ECF No. 40.)  This Court agrees.  Plaintiff is not a licensed physician in good standing with the Ohio Medical Board.  (Ohio eLicense Center Printout, ECF No. 31-2.) Accordingly, Plaintiff's assertions regarding his interpretation of the medical evidence and recitation of treatment received since his release from ODRC do not constitute medical expert testimony. [7]

---

[7] This recitation is unsupported by any medical records.

As to Plaintiff's reliance on the medical evidence, Defendants offer the sworn statements of Defendants de la Cruz and Hale, who are both licensed Doctors of Medicine in good standing with the Ohio Medical Board. (de la Cruz Declaration ¶ 2, ECF No. 31-6; Hale Declaration ¶ 2, ECF No. 31-7.) Defendant de la Cruz explains that the Radiology Report dated April 1, 2014, that reflects that "an MRI could be performed for an additional evaluation if indicated":

> This suggestion means that if a patient presents with objective evidence of impairment of function or mobility, an MRI could be performed. At no point in time do the medical records reflect that Plaintiff demonstrated an alteration in his mobility or ability to function. To the opposite, my interview with Plaintiff revealed that Plaintiff denied having any "numbness," "tingling" or "bladder or bowel incontinence or retention" signifying a lack of neurological involvement.

(*Id*. at ¶ 9.) She also explains that the Radiology Report dated April 24, 2014, simply shows that "there was mild misalignment of one vertebra" and that "the vertebrae did not shift out of place during movement of the lower back." (de la Cruz Declaration ¶ 8, ECF No. 31-6.) She further explains that the later Radiology Report[8] reflects "the same degenerative changes but noted 'multifacet joint disease in the lower lumbar spine' which is essentially arthritis at multiple levels of the spines." (*Id*. at ¶ 17 (quoting the Radiology Report dated December 24, 2014 PAGEID # 196, ECF No. 31-5.) While she recommended an MRI during an initial exam on May 19, 2014, for what appeared to be an acute onset, Defendant de la Cruz explained that the Collegial Review Process would then review that request (*id*. at ¶ 10), and, as noted below, it was concluded that the objective evidence showed that Plaintiff's condition did not warrant an MRI. (Hale Declaration ¶ 10, ECF No. 31-7.) According to Defendant de la Cruz, on July 27, 2015, she found "no evidence of neurological involvement as it pertained to his low back pain complaints

---

[8] Defendant de la Cruz mistakenly refers to an x-ray taken on September 24, 2014, instead of December 24, 2014. (*Id*. at ¶ 17.) However, it is clear from the language she quotes from the Radiology Report and from the citation to the record that she was referring to the x-ray taken on December 24, 2014. (*Id*.)

which would warrant anything more than strengthening exercises and NSAID medications." (de la Cruz Declaration ¶ 22, ECF No. 31-6.) She explains that Plaintiff's prescription for Tramadol needed to be tapered because of his history of substance abuse and "largely due to the lack of any objective medical evidence supporting administration of multiple analgesics[.]" (*Id*. at ¶ 12; *see also id*. at ¶ 16.) She further avers that "the objective evidence demonstrates that Plaintiff's complaints at all times were addressed completely and in a timely manner[,]" specifically identifying Plaintiff's back condition as "chronic, non-limiting back pain without neuropathy and poly-substance addiction." (*Id*. at ¶ 29.)

Defendant Hale agrees with Defendant de la Cruz's assessment of the medical evidence and concurs that Plaintiff's back condition was appropriately addressed. (Hale Declaration ¶ 10, ECF No. 31-7.) Defendant Hale specifically explains that his own examination on September 8, 2014, revealed that Plaintiff had "no neurological involvement whatsoever and in addition, I found that the Plaintiff failed to present with any signs or symptoms of back pain warranting more than strengthening exercises and over the counter NSAID medications." (*Id*. at ¶ 7.) Defendant Hale further avers that the "objective evidence demonstrates that Plaintiff's medical condition did not warrant an MRI, Neurosurgical consult or treatment with Baclofen or Tramadol/Ultram." (*Id*. at ¶ 10.)

In short, this uncontroverted medical evidence establishes that Defendants' delay or refusal in providing an MRI and a neurosurgical consultation as well as tapering or withholding pain medications/muscle relaxers such as Tramadol (Ultram) did not cause a serious medical injury. *See Anthony*, 2017 WL 2992224, at *3; *Santiago*, 734 F.3d at 590).

## 2. Subjective component

Even if Plaintiff had satisfied the objective component of his claim, he has not met the subjective component of his claims against Defendants, which requires a showing from Plaintiff that, "(1) 'the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner'; (2) the official 'did in fact draw the inference'; and (3) the official 'then disregarded that risk.'" *Anthony*, 2017 WL 2992224, at *2 (quoting *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)).

With respect to Defendant de la Cruz, Plaintiff argues that this Defendant was deliberately indifferent when she discontinued Plaintiff's prescription for Tramadol (Ultram). (Opposition 3, ECF No. 37.) Even construing the facts in the light most favorable to Plaintiff, he has failed to meet the subjective component of his claim against Defendant de la Cruz. It was the Collegial Review Committee, which included Defendant Eddy, not Defendant de la Cruz, that tapered Plaintiff's Tramadol prescription. (de la Cruz Declaration ¶ 12, ECF No. 31-6; Interdisciplinary Progress Notes 9, ECF No. 31-3.) Moreover, far from establishing that Defendant de la Cruz inferred and disregarded a substantial risk of serious harm to Plaintiff, the uncontroverted medical evidence detailed above reflects that she carefully and appropriately assessed and addressed Plaintiff's conditions.

Plaintiff nevertheless avers that since being released from ODRC custody, he has seen three different specialists who have provided different treatment than the care he received at PCI. (Plaintiff Declaration ¶¶ 14–21, PAGEID ## 267–68, ECF No. 37.) As an initial matter, "federal courts are generally reluctant to second guess medical judgments." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). Moreover, even if this subsequent treatment evidenced that Defendant de la Cruz's treatment amounted to medical malpractice, such malpractice is not

sufficient to establish the subjective prong of Plaintiff's claim and does not rise to the level of a constitutional violation. *Hearington v. Pandya*, No. 16-1145, 2017 WL 2080273, at *3 (6th Cir. May 15, 2017) ("'Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))); *Payne v. Hamilton County Jail Sheriff's Staff*, No. 1:16-CV-426, 2016 WL 6585579, at *3 (E.D. Tenn. Nov. 7, 2016) (finding that the plaintiff failed to satisfy the subjective component where the defendant determined that the plaintiff's ankle was sprained and that no further medical care was necessary even though it was later found that the plaintiff's ankle was broken).

Plaintiff also contends that Defendant Hale disregarded his serious pain and denied him adequate treatment when this Defendant discontinued his Tramadol and would prescribe only over-the-counter medications. (Opposition 3, ECF No. 37.) This contention is unavailing for the same reasons as detailed with respect to Defendant de la Cruz. Defendant Hale's examination of Plaintiff on September 8, 2014, further supports the conclusion that this Defendant did not infer and disregard a substantial risk of serious harm to Plaintiff. During that examination, Plaintiff denied numbness, tingling, and decreased strength in his lower legs, and presented no difficulty walking on his toes or heels. (Interdisciplinary Notes PAGEID # 205, ECF No. 31-7.) Plaintiff also reported during that examination that he was doing the "Insanity Workout," an extreme cardio workout, three times a week, which someone "with the kind of back pain the Plaintiff describes would find it virtually impossible to perform." (*Id.*; Hale Declaration ¶ 7, ECF No. 31-7.) Defendant Hale therefore found Plaintiff "to have no neurological involvement whatsoever and in addition, I found that the Plaintiff failed to present with any signs or symptoms of back pain warranting more than strengthening exercises and over the counter NSAID medications." (Hale Declaration ¶ 7, ECF No. 31-7.) Plaintiff's own exercise regime and physical symptoms

support Defendant Hale's conclusion that Plaintiff's requested treatment was unnecessary. For all of these reasons, Plaintiff has not satisfied the subjective component as to Defendant Hale.

Finally, Plaintiff, in opposing summary judgment, does not specifically articulate how Defendant Eddy acted with deliberate indifference. However, the Court construes his arguments relating to the Collegial Review Committee, of which Defendant Eddy was a member, as directed against Defendant Eddy, which include discontinuing or rejecting Plaintiff's requests for an MRI, neurosurgical consultation, and pain medication / muscle relaxers. (Opposition 4–5.) The medical record detailed above supports the denial of these requests. In addition, Plaintiff's extensive history of substance abuse supports the decision to taper Plaintiff's prescription for Tramadol and Baclofen. (de la Cruz Declaration ¶¶ 12, 14, ECF No. 31-6; Interdisciplinary Progress Notes 12, ECF No. 31-3.) Tramadol is a narcotic like pain reliever that can be habit forming and "should not be used if a person has a history of drug abuse, alcohol addiction, mental illness or suicide attempt (all of which is in Plaintiff's medical history)." (Hale Declaration ¶ 9.) Similarly, "[d]ue to [Baclofen's] addictive propensity as well as dangerous potential to diminish respirations when combined with narcotics or other pain medications, it has been removed from the Ohio Department of Rehabilitation and Corrections (ODRC) formulary list[.]" (*Id.*) For these reasons, Plaintiff has failed to satisfy the subjective component of his claim against Defendant Eddy.

In short, even construing the facts in the light most favorable to Plaintiff, no reasonable jury could conclude that Defendants acted with deliberate indifference in treating his medical conditions. Contrary to Plaintiff's claims that he was denied medical treatment, the evidence presented establishes that Defendants actively addressed Plaintiff's conditions and regularly adjusted his treatment plans.

**B.     Qualified Immunity**

Defendants are also entitled to qualified immunity with respect to their treatment of Plaintiff.  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "[Q]ualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal quotation marks and citations omitted).  The determination of whether a government official is entitled to qualified immunity is a two-part inquiry. *Miller v. Sanilac County*, 606 F.3d 240, 247 (6th Cir. 2010).  "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred?  Second, was the right clearly established at the time of the violation?" *Id.* (internal quotation marks and citations omitted).  The Court need not consider these questions sequentially. *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009) (citation omitted).  "Once it is determined that the right is clearly established, the [C]ourt must determine 'whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what [the defendant] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights.'" *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994)).

Here, Plaintiff has not adduced sufficient evidence to create a genuine issue of material fact as to whether Defendants acted objectively unreasonably in light of clearly established law. As set forth above, Defendants actively treated Plaintiff's conditions. Plaintiff's dispute over the adequacy of his care does not amount to an Eighth Amendment claim. *Apanovitch*, 32 F. App'x 704, at 707. The Undersigned finds, therefore, that Defendants are entitled to qualified immunity.

## C.     Exhaustion of Administrative Remedies

As an alternative basis, the Undersigned further concludes that Defendant is entitled to summary judgment on the grounds that Plaintiff failed to properly satisfy the exhaustion requirements set forth in the Prison Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a).

Section 1997(e)(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The United States Supreme Court recently re-emphasized that exhaustion is mandatory under the statute and that courts cannot create exceptions to the provision. *Ross v. Blake*, 136 S.Ct. 1850 (2016); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." (citation omitted)). This mandatory exhaustion requirement applies to all lawsuits relating to prison conditions, regardless of the nature of the wrong or the relief sought. *Porter v. Nussle*, 534 U.S. 516, 524 (2002).

"A prisoner's failure to exhaust his intra-prison administrative remedies prior to filing suit 'is an affirmative defense under the PLRA . . . .'" *Surles v. Andison*, 678 F.3d 452, 455 (6th

Cir. 2012) (quoting *Jones*, 549 U.S. at 216).  Defendants bear the burden of proof on the affirmative defense of exhaustion.  *Napier v. Laurel County, Ky.*, 636 F.3d 218, 225 (6th Cir. 2011) (citations omitted) ("[F]ailure to exhaust administrative remedies under the PLRA is an affirmative defense that must be established by the defendants.").  "Summary judgment is appropriate only if defendants establish the absence of a genuine dispute as to any material fact regarding non-exhaustion."  *Surles*, 678 F.3d at 455.  "When a prisoner's complaint contains a combination of exhausted and unexhausted claims, courts are to dismiss the unexhausted claims but retain and address the exhausted claims."  *Reynolds-Bey v. Harris*, 428 F. App'x 493, 500 (6th Cir. 2011) (citing *Jones*, 549 U.S. at 220–24).

"Exhaustion" under the PLRA means "proper exhaustion."  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  To properly exhaust, prisoners must "tak[e] advantage of each step the prison holds out for resolving the claim internally and . . . follow the 'critical procedural rules' of the prison's grievance process to permit prison officials to review and, if necessary, correct the grievance 'on the merits' in the first instance."  *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010); *Jones*, 549 U.S. at 217–18 (noting that proper exhaustion requires "[c]ompliance with prison grievance procedures").

Ohio has established a procedure for resolving inmate complaints.  Ohio Admin. Code § 5120–9–31.  To properly exhaust a claim seeking relief "regarding any aspect of institutional life that directly and personally affects the [inmate]," an inmate at an ODRC facility must comply with the following three-step grievance system:

(1) The filing of an informal complaint - step one:

> Within fourteen calendar days of the date of the event giving rise to the complaint, the inmate shall file an informal complaint to the direct supervisor of the staff member, or department most directly responsible for the particular subject matter of the complaint.  Staff shall respond in writing within seven

calendar days of receipt of the informal complaint. If the inmate has not received a written response from the staff member within a reasonable time, the inmate should immediately contact the inspector of institutional services either in writing or during regular open office hours. The inspector of institutional services shall take prompt action to ensure that a written response is provided to the informal complaint within four calendar days. If a response is not provided by the end of the fourth day, the informal complaint step is automatically waived. Informal complaint responses should reflect an understanding of the inmate's complaint, be responsive to the issue, cite any relevant departmental or institutional rules or policies and specify the action taken, if any. The inspector of institutional services shall monitor staff compliance with the informal complaint process. Any pattern of non-compliance by staff shall be reported to the warden for appropriate action. The filing of an informal complaint may be waived if it is determined by the inspector of institutional services that there is a substantial risk of physical injury to the grievant, the complaint is filed pursuant to rule 5120-9-03 or 5120-9-04 of the Administrative Code, paragraph (H) of this rule, or for other good cause.

(2) The filing of the notification of grievance - step two:

If the inmate is dissatisfied with the informal complaint response, or the informal complaint process has been waived, the inmate may obtain a notification of grievance form from the inspector of institutional services. All inmate grievances must be filed by the inmate no later than fourteen calendar days from the date of the informal complaint response or waiver of the informal complaint step. The inspector of institutional services may also waive the timeframe for the filing of the notification of grievance, for good cause. The inspector of institutional services shall provide a written response to the grievance within fourteen calendar days of receipt. The written response shall summarize the inmate's complaint, describe what steps were taken to investigate the complaint and the inspector of institutional service's findings and decision. The inspector of institutional services may extend the time in which to respond, for good cause, with notice to the inmate. The chief inspector or designee shall be notified of all extensions. Any extension exceeding twenty-eight calendar days from the date the response was due must be approved by the chief inspector or designee. Expedited responses shall be made to those grievances that, as determined by the inspector of institutional services, present a substantial risk of physical injury to the grievant or for other good cause.

(3) The filing of an appeal of the disposition of grievance - step three:

If the inmate is dissatisfied with the disposition of grievance, the inmate may request an appeal form from the inspector of institutional services. The appeal must then be filed to the office of the chief inspector within fourteen

calendar days of the date of the disposition of grievance.[9]  For good cause the chief inspector or designee(s) may waive such time limits.  The chief inspector or designee(s) shall provide a written response within thirty calendar days of receipt of the appeal.  The chief inspector or designee(s) may extend the time in which to respond for good cause, with notice to the inmate.  The decision of the chief inspector or designee is final. Grievance appeals concerning medical diagnosis or a specific course of treatment shall be investigated and responded to by a health care professional.

Ohio Admin. Code § 5120–9–31(K).

As applied here, the Undersigned concludes that Defendants have satisfied their burden of proving that Plaintiff failed to exhaust his administrative remedies.  As set forth above, Plaintiff was required to "properly exhaust" his claims, which required him to follow the "critical procedural rules" of ODRC's grievance process.  *See Reed-Bey*, 603 F.3d at 324.  As applicable to this case, "[p]roper exhaustion demands compliance with an agency's deadlines . . . because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Woodford*, 548 U.S. at 90-91; *see also Scott v. Ambani*, 577 F.3d 642, 647 (6th Cir. 2009) ("Woodford makes clear that a prisoner cannot satisfy the PLRA exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance." (citation omitted)).  This is true even though the appeal was alternatively considered on the merits.  *Vandiver v. Corr. Med. Servs., Inc*., 326 F. App'x 885, 889 (6th Cir. 2009) ("Where the grievance is denied alternatively on the merits and for failure to comply with critical grievance procedures, a later action will be subject to dismissal for failure to properly exhaust under *Woodford*." (citation omitted)); *Marshal v. Ohio Dep't of Rehab. & Corrs*., No. 2:14-cv-338, 2017 WL 2210866, at *3 (S.D. Ohio May 19, 2017) (concluding that Ohio inmate had

---

[9] The Court notes that Defendants erroneously stated that Ohio Admin. Code § 5120-9-31(K)(3) provides that an inmate has "fourteen (14) days from *the time he receives a response from the institutional inspector,* to appeal the same to the Chief Inspector's Office."  (Motion 4–5, ECF No. 31) (emphasis added.)

failed to properly exhaust administrative remedies where his appeal to the Chief Inspector was untimely and the Chief Inspector had concluded that the appeal was untimely and alternatively considered the merits of the appeal).

Specifically, Defendants have produced uncontroverted evidence that Plaintiff submitted an Informal Complaint Resolution ("ICR") regarding his back pain on December 1, 2014. (ICR PAGEID # 292, ECF No. 40-1.) The evidence demonstrates that a PCI staff member responded to this ICR on December 4, 2014. (*Id.*) Pursuant to step two of Ohio's grievance procedure, Plaintiff had fourteen days from the December 4, 2014, ICR response to file his notification of grievance. Ohio Admin. Code § 5120-9-31(K)(2). Thus, Plaintiff's notification of grievance was due on or before December 18, 2014. The evidence reflects, however, that Plaintiff did not file the requisite notice of grievance until December 20, 2014,[10] at the earliest, which is untimely under Ohio's grievance procedure. (Notification of Grievance PAGEID # 293, ECF No. 40-1.)[11]

The uncontroverted evidence further reflects that on January 6, 2015, Plaintiff's notification of grievance was denied. (Disposition of Grievance PAGEID ## 294–96, ECF No. 40-2.) Pursuant to step three of Ohio's grievance procedure, Plaintiff had fourteen days from the January 6, 2015, to appeal the denial of his notification of grievance. Ohio Admin. Code § 5120-9-31(K)(3). Thus, Plaintiff's appeal of the denial of his grievance was due on or before January 20, 2015. The evidence demonstrates that Plaintiff filed his appeal on February 13, 2015, which is untimely under Ohio's grievance procedure. (Appeal to the Chief Inspector PAGEID # 297,

---

[10] The Notification of Grievance is dated December 22, 2014, but the Chief Inspector later states that it was dated December 20, 2014. (Decision of Chief Inspector PAGEID # 299, ECF No. 40-3.)

[11] The Court notes that both Plaintiff and Defendants dispute at one point as to whether deficiencies existed at the third step of Ohio's grievance procedure, but their references to dates reflect that they apparently intended to refer to the third step of the grievance procedure. (Motion 5, ECF No. 31; Opposition 6–7, ECF No. 37; Reply 14, ECF No. 40.)

ECF No. 40-3.)  On appeal, the Chief Inspector stated that Plaintiff's grievance was untimely and alternatively concluded that it lacked merit.  (Decision of Chief Inspector PAGEID # # 298–301, ECF No. 40-3.)  Because Plaintiff's grievance was rejected as untimely, he failed to properly exhaust his administrative remedies.  *See, e.g.*, *Scott*, 577 F.3d at 647; *Vandiver*, 326 F. App'x at 889; *Marshal*, 2017 WL 2210866, at *3.

Accordingly, should the Court be inclined to find an another basis for disposition of the matter, the Undersigned alternatively **RECOMMENDS DISMISSAL** of Plaintiff's excessive force claim against Defendants **WITHOUT PREJUDICE** for failure to properly exhaust his administrative remedies.  *See Boyd v. Corrs. Corp. of Am.*, 380 F.3d 989, 994 (6th Cir. 2006) ("A dismissal under § 1997e should be without prejudice." (citing *Knuckles El v. Toombs*, 215 F.3d 640 (6th Cir. 2000)).

## IV.

For the reasons set forth above, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED** (ECF No. 31).

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**IT IS SO ORDERED.**


Date:  August 14, 2017                                    s/ *Elizabeth A. Preston Deavers*
                                                         ELIZABETH A. PRESTON DEAVERS
                                                         UNITED STATES MAGISTRATE JUDGE